LOUISE GRAY                          *        IN THE
8736 Church Lane
Randallstown, MD 21133               *        CIRCUIT COURT

    *Plaintiff*,                    *        FOR

v.                                   *        BALTIMORE COUNTY

AUROBINDO PHARMA LTD.,               *        Case No.:  C-03-CV-22-000118
Water Mark Building, Plot No. 11,
Survey no.9, Kondapur,               *
Hitech City, Hyderabad – 500 084
Telangana, India                     *

and                                  *

AUROBINDO PHARMA USA, INC.           *
279 Princeton Hightstown Road
East Windsor, NJ 08520               *

    Serve On: Corporation Svc. Co.    *
        Princeton South Corp. Ctr.
        Suite 160                      *
        100 Charles Ewing Blvd.
        Ewing, NJ 08628                *

and                                  *

SCIEGEN PHARMACEUTICALS, INC.,       *
89 Arkay Drive
Hauppauge, New York 11788            *

    Serve On: Resident Agent           *
        89 Arkay Drive
        Hauppauge, NY 11788            *

and                                  *

WESTMINSTER PHARMACEUTICALS,         *
LLC,
1321 Murfreesboro Pike, Suite 607    *
Nashville, Tennessee 37217
                                     *

    Serve On: Resident Agent
        1321 Murfreesboro Pike,        *
        Suite 607

Nashville, Tennessee 37217 *

and                                        *

WALMART INC.,                              *
701 South Walton Blvd.
Bentonville, AR 72716                      *

    Serve On: The Corporation Trust. *
               Inc,
               2405 York Road, Ste. 201*
               Lutherville Timonium,
               MD 21093-2264          *

and                                        *

MACLEODS PHARMACEUTICALS LTD.*
Atlanta Arcade
Marol Church Road                          *
Andheri (E)
Mumbai: 400059                             *

and                                        *

MACLEODS PHARMA, USA, INC.;                *
103 College Rd E
2nd Flr, Princeton, NJ 08540               *

    Serve On: Paul Krauthauser          *
               103 College Road East
               2nd Floor               *
               Princeton, NJ 08540
                                       *

and                                        *

PRINSTON PHARMACEUTICAL
INC. dba SOLCO HEALTHCARE US LLC *
700 Atrium Drive, Suite A,
Somerset, NJ 08873                         *

    Serve On:                           *

                                       *

                                       *
and

| | |
|---|---|
| ZHEJIANG HUAHAI | * |
| PHARMACEUTICAL CO. | |
| LTD. | * |
| Zhejiang Huahai Pharmaceutical | |
| Coastal Industrial Zone, Chuannan No. 1 | * |
| Branch No. 9 | |
| Donghai Fifth Avenue, Linhai, | * |
| Taizhou Zhejiang 317016 | |
| | * |
| and | |
| | * |
| HUAHAI US, INC. | |
| 2002 Eastpark Blvd | * |
| East Windsor, NJ 08512 | |
| | * |
| Serve On: Jun Du | |
| 700 Atrium Drive, 2nd Floor | * |
| Suite B | |
| Somerset, NJ 08873 | * |
| | |
| *Defendants*. | * |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Louise Gray ("Plaintiff"), brings this action against Defendants Aurobindo Pharma Ltd., Aurobindo Pharma, USA, Inc., SciGen Pharmaceuticals, Inc., Westminster Pharmaceuticals, LLC, Walmart Inc., Macleods Pharmaceuticals, Ltd., Macleods Pharma, USA, Inc., Prinston Pharmaceutical, Inc. d/b/a Solco Healthcare US, LLC and Zhejiang Huahai Pharmaceutical Co., Ltd.  Plaintiff alleges as follows upon personal knowledge as to facts pertaining to herself, and upon information and belief based on the investigation of her counsel as to all other matters.

## NATURE OF THE CASE

1.     Plaintiff brings this action regarding Defendants' respective manufacturing, distribution, and sale of generic irbesartan prescription medications containing an active pharmaceutical ingredient ("API"), which had been adulterated with *N*-nitrosodiethylamine ("NDEA"), a probable human carcinogen.

2.      Irbesartan is a prescription medication mainly used to treat high blood pressure and diabetic nephropathy.

3.      Due to manufacturing defects originating in Defendant Aurobindo Pharma Ltd.'s ("Aurobindo") facility in India, certain batches of irbesartan's active pharmaceutical ingredients were supplied to Defendant ScieGen Pharmaceuticals, LLC ("ScieGen"), and thus introduced to the United States market, adulterated, with the probable human carcinogen NDEA (the "Adulterated Irbesartan").

4.      After ScieGen used the Adulterated Irbesartan to manufacture and produce finished generic prescription irbesartan tablets, ScieGen shipped the tablets containing Adulterated Irbesartan to Defendant Westminster Pharmaceuticals ("Westminster") in or about Tampa, Hillsborough County, Florida.

5.      Westminster, in turn, further manufactured, labeled, packaged, and distributed the tablets containing Adulterated Irbesartan to pharmaceutical retailers nationwide, including Defendant Walmart Inc. ("Walmart").

6.      Plaintiff purchased and ingested tablets containing Adulterated Irbesartan from her local Walmart pharmacy as part of a medical treatment regimen.

7.      Generic drugs such as irbesartan are marketed and sold to consumers such as Plaintiff when the patent for the brand-name version of the drug expires, and other competitors are able to seek approval for, market, and sell bioequivalent versions of the brand-name drug. These generic equivalents, such as irbesartan, are supposed to be of equal quality and equal safety as the brand-name drugs.

8.      Plaintiff was injured by paying the full purchase price of their medications containing Adulterated Irbesartan and by paying for incidental medical expenses. These

medications are worthless because they are contaminated with carcinogenic and harmful NDEA and are thus not fit for human consumption.

9.      Plaintiff brings suit in order to receive equitable relief and to recover economic damages and restitution for: (1) strict product liability; (2) failure to warn; (3) breach of contract; (4) breach of implied warranty of merchantability; (5) unjust enrichment; (6) fraudulent concealment; (7) conversion; (8) negligence; and (9) gross negligence; and (10) violations of the Maryland Consumer Protection Act Title 13, Subtitle 3, § 13-301 et seq.

## PARTIES

10.      Plaintiff, Louise Gray, is an individual who is a citizen of the State of Maryland, domiciled in Baltimore County, Maryland. During all relevant time periods, Plaintiff was prescribed, purchased, and consumed Adulterated Irbesartan manufactured, distributed, and sold by Defendants.

11.      When purchasing her Adulterated Irbesartan manufactured and distributed by Defendants, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturers, distributors, and pharmacy (in her case, Walmart), that the medications were properly manufactured and free from adulteration and defects.

12.      Plaintiff relied on these representations and warranties in deciding to purchase the irbesartan manufactured, distributed, and sold by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Defendants' medication contaminated with Adulterated Irbesartan if she had known that such medication was not, in fact, properly manufactured and free from adulteration and defects.

13.      Plaintiff also understood that each purchase involved a direct transaction between

herself and Defendants because her medication came with packaging and other materials prepared by Defendants, including representations and warranties that her medication was properly manufactured and free from adulteration and defects.

14.     On information and belief, Defendant Aurobindo is a corporation organized and existing under the laws of the Republic of India. It maintains its principal place of business in Hitech City, Hyderabad, India. Aurobindo presently maintains its United States headquarters, through its American subsidiary Aurobindo Pharma USA Inc., in East Windsor, New Jersey. Aurobindo has been engaged in the manufacturing, distribution, and sale of Adulterated Irbesartan in the United States, including but not limited to within the State of Maryland.

15.     Defendant Aurobindo's purposeful availment of the benefits and protections of the State of Florida commenced on or about July 7, 2001, when Aurobindo applied to the Florida Secretary of State's Division of Corporations for authorization to transact business in Florida as a foreign corporation. Aurobindo's application was granted on or about that date, and Aurobindo was thus authorized by the Florida Secretary of State's Division of Corporations to transact business in Florida as a foreign corporation. Aurobindo thereafter maintained a registered agent in Miami-Dade County, Florida in connection with its Florida foreign corporation authorization until its Florida registration was revoked on or about September 21, 2001 for its failure to file an annual report with the Florida Secretary of State, Division of Corporations.

16.     On information and belief, Aurobindo supplies active pharmaceutical ingredients ("API"), including irbesartan API, to United States manufacturers, who in turn produce finished products, with the expectation and actual knowledge that its API will be purchased and/or used in other drug products purchased throughout the United States, including within the State of Florida and within the State of Maryland.

17.     Aurobindo touts in its most recent annual report that it is a "leading global pharmaceutical company producing generic formulations and active pharmaceutical ingredients (APIs)."

18.     Defendant ScieGen is a corporation organized under the laws of the State of New York. It maintains its principal place of business in Hauppauge, Suffolk County, New York. ScieGen has been engaged in the manufacturing, national distribution, and national sale of Adulterated Irbesartan, including within the State of Florida and within the State of Maryland.

19.     Defendant Westminster is a limited liability company organized under the laws of the State of Delaware. Westminster maintains its principal place of business in Nashville, Tennessee. Westminster has been engaged in the manufacturing, national sale, and national distribution of Adulterated Irbesartan, including within Florida and within the State of Maryland.

20.     Defendant Walmart Inc. is a corporation organized under the laws of the State of Delaware. It maintains its principal place of business in Bentonville, Arkansas.

21.     Walmart operates 48 stores in the state of Maryland, including but not limited to the 8730 Liberty Rd, Randallstown, MD 21133 location which was Plaintiff's pharmacy and where she procured the Adulterated Irbesartan.

22.     On information and belief, Defendant Macleods Pharmaceuticals, Ltd. is a corporation organized and existing under the laws of the Republic of India. It maintains its principal place of business in Atlanta Arcade, Andheri, Mumbai, India. Macleods presently maintains its United States headquarters, through its American subsidiary Macleods Pharma, USA, Inc., in Princeton, New Jersey. Macleods has been engaged in the manufacturing, distribution, and sale of Adulterated Irbesartan in the United States, including but not limited to within the State of Maryland.

23.     On information and belief, Defendant Prinson Pharmaceutical Inc d/b/a Solco

Healthcare US Inc. is a corporation organized and existing under the laws of the State of New

Jersey. It maintains its principal place of business in Somerset, New Jersey. Prinson/Solco has

been engaged in the manufacturing, distribution, and sale of Adulterated Irbesartan in the United

States, including but not limited to within the State of Maryland.

24.     On information and belief, Defendant Zhejiang Huahai Pharmaceutical Co., Ltd.

is a corporation organized and existing under the laws of the Republic of China. It maintains its

principal place of business in Taizhou, Zhejiang, China.  Zhejiang Huahai presently maintains its

United States headquarters, through its American subsidiary Huahai US, Inc., in East Windsor,

New Jersey. Zhejiang Huahai has been engaged in the manufacturing, distribution, and sale of

Adulterated Irbesartan in the United States, including but not limited to within the State of

Maryland.

## JURISDICTION AND VENUE

25.     On information and belief, at all times relevant Defendants availed themselves of

conducting business in the state of Maryland.

26.     On information and belief, at all times relevant Defendants each benefitted from

Maryland's system of laws, infrastructure and business climate for the sale of their products,

including prescription irbesartan.

27.     On information and belief, Defendants' manufacture, marketing, distribution

and/or sale of Adulterated Irbesartan and medications containing Adulterated Irbesartan resulted

in millions of dollars in profits to Defendants. Defendants' profits are a direct result of their

selection of Maryland and other states to conduct business.

28.     On information and belief, at all times relevant Aurobindo delivered the

Adulterated Irbesartan into the stream of commerce with the knowledge and expectation that it would thereafter be processed, packaged, and labeled in Hillsborough County, Florida, and distributed from Hillsborough County, Florida for sale throughout the United States, including the State of Maryland.

29.     On information and belief, at all times relevant ScieGen sold and/or distributed and/or delivered prescription medication containing Adulterated Irbesartan to customers within the State of Maryland, including its customer, Westminster.

30.     On information and belief, negotiations and/or dealings concerning ScieGen's distributions or sales of Adulterated Irbesartan to Westminster occurred within Florida and within the State of Maryland.

31.     On information and belief, at all times relevant Walmart solicited and /or purchased prescription medications containing Adulterated Irbesartan for the purpose of resale from vendors within Florida and within the State of Maryland, including Westminster. The material terms of Walmart's resale of Westminster products, including Adulterated Irbesartan, were decided upon in whole or in part within the State of Maryland.

32.     Plaintiff's causes of action arise out of Defendants' contacts and activities within the State of Maryland and as such Defendants are subject to personal jurisdiction in the State of Maryland because Plaintiff's claims arise from Defendants' actions in conducting and engaging in business in the State of Maryland, and Defendants' commission of tortious acts in the State of Maryland.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District and because Defendants are subject to personal jurisdiction within this District.

**BACKGROUND AND DEFENDANTS' CONDUCT**

34.    Irbesartan is a generic drug generally used to treat high blood pressure and diabetic nephropathy, a complication of type 2 diabetes affecting the kidneys.

35.    Irbesartan is the generic form of the brand-name drug Avapro. Avapro was initially approved by the United States Food & Drug Administration ("FDA") and marketed in the United States in 1997.

36.    At all times during the period alleged herein, Defendants each represented and warranted to consumers that their generic irbesartan products were therapeutically equivalent to and otherwise the same as brand Avapro, were otherwise fit for their ordinary use, and were otherwise manufactured and distributed in accordance with applicable laws and regulations.

37.    The Drug Price Competition and Patent Term Restoration Act of 1984 – more commonly referred to as the Hatch-Waxman Act – is codified at 21 U.S.C. § 355(j).

38.    Brand drug companies submitting a New Drug Application ("NDA") are required to demonstrate clinical safety and efficacy through well-designed clinical trials. 21 U.S.C. § 355 *et seq.*

39.    By contrast, generic drug companies submit an Abbreviated New Drug Application ("ANDA"). Instead of demonstrating clinical safety and efficacy, generic drug companies need only demonstrate bioequivalence to the brand or reference listed drug ("RLD"). Bioequivalence is the "absence of significant difference" in the pharmacokinetic profiles of two pharmaceutical products. 21 C.F.R. § 320.1(e).

40.    The bioequivalence basis for ANDA approval is premised on the generally accepted proposition that equivalence of pharmacokinetic profiles of two drug products is accepted as evidence of therapeutic equivalence. In other words, if (1) the RLD is proven to be

safe and effective for the approved indication through well-designed clinical studies accepted by the FDA, and (2) the generic company has shown that its ANDA product is bioequivalent to the RLD, then (3) the generic ANDA product must be safe and effective for the same approved indication as the RLD.

41.     In other words, generic drug manufacturers have an ongoing federal duty of sameness in their products. Under 21 U.S.C. § 355(j), the generic manufacturer must show the following things as relevant to this case: the active ingredient(s) are the same as the RLD, § 355(j)(2)(A)(ii); and, that the generic drug is "bioequivalent" to the RLD and "can be expected to have the same therapeutic effect," *id.* at (A)(iv). A generic manufacturer (like a brand manufacturer) must also make "a full statement of the composition of such drug" to the FDA. *Id.* at (A)(vi); *see also* § 355(b)(1)(C).

42.     A generic manufacturer must also submit information to show that the "labeling proposed for the new drug is the same as the labeling approved for the [RLD][.]" 21 U.S.C. § 355(j)(2)(A)(v).

43.     Upon granting final approval for a generic drug, the FDA will typically state the generic drug is "therapeutically equivalent" to the branded drug. The FDA codes generic drugs as "A/B rated" to the RLD branded drug. Pharmacists, physicians, and patients can fully expect such generic drugs to be therapeutically interchangeable with the RLD, and generic manufacturers expressly warrant as much through the inclusion of the same labeling as the RLD delivered to consumers in each and every prescription of its generic products.

44.     Under federal law, pharmaceutical drugs must be manufactured in accordance with "Current Good Manufacturing Practices" ("CGMPs") to assure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

45.     The FDA's CGMP regulations are found in 21 C.F.R. Parts 210 and 211. These

detailed regulations set forth minimum standards regarding organization and personnel (Subpart

B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug

product containers and closures (Subpart E); production and process controls (Subpart F);

packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory

controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products

(Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is

making drugs intended to be distributed in the United States.

46.     Any drug not manufactured in accordance with CGMPs is deemed "adulterated"

and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).

47.     Drugs are deemed to be adulterated if the manufacturer fails to comply with

CGMPs to assure the drugs' safety, quality, purity, identity, and strength and/or if they are

contaminated. *See* 21 U.S.C. § 351(a)(2)(A), (B). Federal law prohibits a manufacturer from

directly or indirectly causing adulterated drugs to be introduced or delivered for introduction into

interstate commerce. *See id.* § 331(a). States have enacted laws adopting or mirroring these

federal standards.

48.     Per federal law, CGMPs include "the implementation of oversight and controls

over the manufacture of drugs to ensure quality, including managing the risk of and establishing

the safety of raw materials, materials used in the manufacturing of drugs, and finished drug

products." 21 U.S.C. § 351(j). Accordingly, it is a CGMP violation for a manufacturer to

contract out prescription drug manufacturing without sufficiently ensuring continuing quality of

the subcontractors' operations.

49.     The FDA investigated Aurobindo's manufacturing plant located in Hyderabad,

India in April 2017.

50.     The FDA subsequently issued Aurobindo a "Form 483," a standard document used to identify conditions that may violate the Food, Drug, and Cosmetic Act and also violate CGMPs.

51.     The FDA's April 2017 inspection revealed that Aurobindo was, at the time of that inspection, failing to maintain its facilities in an acceptable state and failing to maintain its manufacturing equipment in an appropriate state, that Aurobindo's laboratory controls did not include appropriate test measures, and that Aurobindo's batch distribution processes were not the subject of thorough reviews.

52.     In February 2018, the FDA returned for another investigation of Aurobindo's Hyderabad manufacturing plant.

53.     As a result of this follow-up investigation, the FDA issued Aurobindo with another Form 483, repeating the same quality-control concerns—unsanitary equipment, as well as, notably, the presence of mosquitos in close proximity to drug product—that could alter the safety, identity, strength, quality, or purity of its manufactured drug product.

54.     As a result of Aurobindo's poor quality-control measures and failure to comply with CGMPs, its irbesartan API became adulterated and contaminated by NDEA.

55.     NDEA is not an FDA-approved ingredient for branded Avapro or generic irbesartan. None of Defendants' irbesartan products (or any irbesartan product, for that matter) identify NDEA as an ingredient on their products' labels or elsewhere.

56.     The FDA maintains a list of "Approved Drug Products with Therapeutic Equivalence Evaluations" commonly referred to as the Orange Book.

57.     The Orange Book is a public document; Defendants sought and received the

inclusion of their products in the Orange Book upon approval of their irbesartan ANDAs.

58.     In securing FDA approval to market generic irbesartan in the United States as an

Orange Book-listed therapeutic equivalent to Avapro, Defendants were required to demonstrate

that their generic irbesartan products were bioequivalent to brand Avapro.

59.     Therapeutic equivalence for purposes of generic substitution is a continuing

obligation on the part of the manufacturer. For example, according to the FDA's Orange Book,

therapeutic equivalence depends in part on the manufacturer's continued compliance with

CGMPs.

60.     By introducing their irbesartan products into the United States market under the

name "irbesartan", as a therapeutic equivalent to Avapro and with the FDA approved label that is

the same as that of Avapro, Defendants represented and warranted to end users that their

products are in fact the same as and are therapeutically interchangeable with Avapro.

61.     Defendants' irbesartan products were accompanied by an FDA-approved label.

62.     By presenting consumers with an FDA-approved irbesartan label, Defendants, as

manufacturers, distributors, and sellers of irbesartan, made representations and express or

implied warranties to consumers of the "sameness" of their products to Avapro, and that their

products were consistent with the safety, quality, purity, identity, and strength characteristics

reflected in the FDA-approved labels and/or were not adulterated.

63.     The presence of NDEA in the Adulterated Irbesartan: (1) renders Defendants'

irbesartan products non-bioequivalent (*i.e.*, not the same) to Avapro and thus non-therapeutically

interchangeable with Avapro, thus breaching Defendants' express warranties of sameness; (2)

was the result of gross deviations from CGMPs thus rendering Defendants' irbesartan products

non-therapeutically equivalent to Avapro, and thus breaching Defendants' warranties of

sameness; and (3) resulted in Defendants' irbesartan containing an ingredient that is not also

contained in Avapro, also breaching Defendants' warranty of sameness (and warranty that the

products contained the ingredients listed on each Defendants' FDA-approved label).

64.     Each Defendant willfully, recklessly, and/or negligently failed to ensure their

irbesartan products' labels and other advertising or marketing statements accurately conveyed

information about their products.

65.     Due to its status as a probable human carcinogen as listed by both the

International Agency for Research on Cancer ("IARC") and as determined by pharmaceutical

regulators such as the European Medicines Agency and the FDA, NDEA is not an FDA-

approved ingredient in irbesartan. The presence of NDEA in the Adulterated Irbesartan results in

Defendants' irbesartan products being non-merchantable and not fit for its ordinary purposes

(i.e., as a therapeutically interchangeable generic version of Avapro), breaching Defendants'

implied warranties of merchantability and/or fitness for ordinary purposes.

66.     For these and other reasons, Defendants' irbesartan is therefore adulterated. *See*

21 U.S.C. § 351.

67.     Medications containing Adulterated Irbesartan are essentially worthless. No

consumer would purchase an Adulterated Irbesartan product, or is even allowed to purchase

adulterated irbesartan because it was illegally introduced into the United States. This is

especially so given that alternative, non-adulterated irbesartan products or competing

medications with the same approved indications were available from other manufacturers.

68.     On October 26, 2018, when the FDA announced that Aurobindo had recalled

several Batches of irbesartan API that it had dispatched to ScieGen (the "Aurobindo Recall").[2]

69.     Aurobindo recalled 22 Batches of its irbesartan API, all supplied to ScieGen, and

all contaminated with NDEA:

| S.No | Manufacturing Batch Number | Dispatch Batch Number | Date of Manufacture | Date of Distribution | Retest/ Expiry Date | Dispatch Qty | Name and Location of the Customer | NDEA Impurity Result ug/g |
|------|---------------------------|----------------------|---------------------|---------------------|--------------------|--------------|----------------------------------|---------------------------|
| 1 | 1601100782 | 1601101589 | Jan-2016 | Jan-2016 | Dec-2016 | 90.29 Kg | Sciegen Pharmaceuticals INC, USA | 0.23 |
| 2 | 1601100783 | 1601101590 | Jan-2016 | 31-Jan-2016 | Dec-2016 | 59.61 Kg | Sciegen Pharmaceuticals INC, USA | 0.28 |
| 3 | 1701111861 | 1701113404 | 13-Sep-2017 | 7-Oct-2017 | 12-Sep-2020 | 88.48 Kg | Sciegen Pharmaceuticals INC, USA | 0.47 |
| 4 | 1701112170 | 1701113405 | 18-Sep-2017 | 7-Oct-2017 | 17-Sep-2020 | 90.92 Kg | Sciegen Pharmaceuticals INC, USA | 0.15 |
| 5 | 1701112501 | 1701113406 | 20-Sep-2017 | 7-Oct-2017 | 19-Sep-2020 | 93.02 Kg | Sciegen Pharmaceuticals INC, USA | 1.61 |
| 6 | 1701112056 | 1701113407 | 13-Sep-2017 | 7-Oct-2017 | 12-Sep-2020 | 88.82 Kg | Sciegen Pharmaceuticals INC, USA | 0.53 |
| 7 | 1701112558 | 1701114283 | 2-Oct-2017 | 25-Oct-2017 | 1-Oct-2020 | 63.76 Kg | Sciegen Pharmaceuticals INC, USA | 0.6 |

---

[2] *Aurobindo Pharma Limited Issues Voluntary Recall of Irbesartan Drug Substance due to the Detection of Trace Amounts of NDEA (NNitrosodiethylamine) Impurity Found in the Active Pharmaceutical Ingredient (API)*, U.S. FOOD & DRUG ADMINISTRATION (Oct. 26, 2018), https://www.fda.gov/Safety/Recalls/ucm624547.htm.

| S.No | Manufacturing Batch Number | Dispatch Batch Number | Date of Manufacture | Date of Distribution | Retest/ Expiry Date | Disp atch Qty | Name and Location of the Customer | NDEA Impurity Result ug/g |
|------|------|------|------|------|------|------|------|------|
| 8 | 1701112558 | 1701114 284 | 2-0ct-2017 | 25-0ct-2017 | 1-Oct-2020 | 27.06 Kg | Sciegen Pharmaceutic als INC, USA | 0.6 |
| 9 | 1701I12559 | 1701114 285 | 3-0ct-2017 | 25-0ct-2017 | 2-0ct-2020 | 91.82 Kg | Sciegen Pharmaceutic als INC, USA | 0.45 |
| 10 | 1701112589 | 1701114 286 | 6-0ct-2017 | 25-0ct-2017 | 5-0ct-2020 | 90.32 Kg | Sciegen Pharmaceutic als INC, USA | 0.28 |
| 11 | 1701113300 | 1701114 289 | 7-0ct-2017 | 25-0ct-2017 | 6-0ct-2020 | 91.32 Kg | Sciegen Pharmaceutic als INC, USA | 0.32 |
| 12 | 1701113301 | 1701114 291 | 8-0ct-2017 | 25-0ct-2017 | 7-0ct-2020 | 90.12 Kg | Sciegen Pharmaceutic als INC, USA | 0.32 |
| 13 | 1701113302 | 1701114 708 | 17-0ct-2017 | 30-0ct-2017 | 16-0ct-2020 | 80.82 Kg | Sciegen Pharmaceutic als INC, USA | 0.85 |
| 14 | 1701113312 | 1701114 709 | 20-0ct-2017 | 30-0ct-2017 | 19 Oct 2020 | 86.82 Kg | Sciegen Pharmaceutic als INC, USA | 0.88 |
| 15 | 1701115460 | 1701117 039 | 23-Nov-2017 | 2l-Dec-2017 | 22-Nov-2020 | 16.72 Kg | Sciegen Pharmaceutic als INC, USA | 0.31 |
| 16 | 1701115974 | 1701117 040 | 29-Nov-2017 | 2l-Dec-2017 | 28-Nov-2020 | 91.12 Kg | Sciegen Pharmaceutic als INC, USA | 0.26 |
| 17 | 1701115460 | 1701117 041 | 23-Nov-2017 | 2l-Dec-2017 | 22-Nov-2020 | 89.79 Kg | Sciegen Pharmaceutic als INC, USA | 0.31 |
| 18 | 1701115738 | 1701117 042 | 24-Nov-2017 | 21-Dec-2017 | 23-Nov-2020 | 90.42 Kg | Sciegen Pharmaceutic als INC, USA | 0.38 |

| S.No | Manufacturing Batch Number | Dispatch Batch Number | Date of Manufacture | Date of Distribution | Retest/ Expiry Date | Dispatch Qty | Name and Location of the Customer | NDEA Impurity Result ug/g |
|------|---------------------------|----------------------|---------------------|---------------------|---------------------|--------------|-----------------------------------|---------------------------|
| 19 | 1701115739 | 1701117043 | 25-Nov-2017 | 2l-Dec-2017 | 24-Nov-2020 | 89.79 Kg | Sciegen Pharmaceuticals INC, USA | 0.44 |
| 20 | 1701115740 | 1701117044 | 26-Nov-2017 | 2l-Dec-2017 | 25-Nov-2020 | 93.42 Kg | Sciegen Pharmaceuticals INC, USA | 0.34 |
| 21 | 1701115741 | 1701117045 | 27-Nov-2017 | 21-Dec-2017 | 26-Nov-2020 | 93.72 Kg | Sciegen Pharmaceuticals INC, USA | 0.39 |
| 22 | 1701115742 | 1701117046 | 28-Nov-2017 | 21-Dec-2017 | 27-Nov-2020 | 93.62 Kg | Sciegen Pharmaceuticals INC, USA | 0.31 |

(https://www.fda.gov/Safety/Recalls/ucm624547.htm)

      70.    In turn, the FDA announced that, on October 30, 2018, ScieGen had issued its

own recall of irbesartan that it supplied to Westminster as well as Golden State Medical Supply,

Inc. (the "ScieGen Recall").[3]

71.     The ScieGen recall specified which irbesartan Lots sent to Westminster were

subject to the recall:

## Details of batches sent to Westminster

The Irbesartan tablets subject to recall are packed in 30-count and 90-count bottles. To
help identify any recalled product, the NDCs, product description, lot numbers and expiration
dates are listed below. These lots were distributed nationwide in the USA to Westminster's direct
accounts.

---

3 *Sciegen Pharmaceuticals, Inc. Issues Voluntary Nationwide Recall of Irbesartan Tablets, USP 75 Mg,
150 Mg, and 300 Mg Due to the Detection of Trace Amounts of NDEA (N-Nitrosodiethylamine) Impurity
Found in the Active Pharmaceutical Ingredient (API)*, U.S. FOOD & DRUG ADMINISTRATION (Oct. 30,
2018), https://www.fda.gov/Safety/Recalls/ucm624593.htm.

| DC# | Product Description | Lot# | Expiration Date |
|---|---|---|---|
| 69367-119-01 | Irbesartan 75mg Tablets, 30 count bottle | B160002A | Sep-19 |
| 69367-119-03 | Irbesartan 75mg Tablets, 90 count bottle | B160002B | Sep-19 |
| 69367-120-01 | Irbesartan 150mg Tablets, 30 count bottle | B161005A | Sep-19 |
| | | C161002A | Feb-20 |
| 69367-120-03 | Irbesartan 150mg Tablets, 90 count bottle | B161005B | Sep-19 |
| | | C161002B | Feb-20 |
| 69367-121-01 | Irbesartan 300mg Tablets, 30 count bottle | B162008A | Sep-19 |
| | | C162002A | Feb-20 |
| 69367-121-03 | Irbesartan 300mg Tablets, 90 count bottle | B162008B | Sep-19 |
| | | C162002B | Feb-20 |

(https://www.fda.gov/Safety/Recalls/ucm624593.htm)

72.     Because the ScieGen Recall specifically referenced it, Westminster joined in the

FDA's irbesartan recall efforts.

73.     Westminster's public-facing website features a link to the ScieGen Recall, as well

as an explanation from Westminster CEO Gajan Mahendiran: "The recall of Irbesartan Tablets

was unexpected but initiated with public health and safety at the forefront of this decision. The

NDEA impurity found in the API was not present in the initial batches of API and only present in the most recent batches, which are being recalled. Westminster will remain diligent and steadfast in its approach to quality, efficacy, and the safety of its patients."

74.     The above statement is not Westminster's only claimed commitment to diligence, quality, and safety—as for its "mission," Westminster commits to a culture of responsibility and trust: "Our governance, ethical practices and policies are focused on building a culture of responsibility where our everyday actions are governed by a duty of trust."[5]

76.     As for its manufacturing processes specifically, Westminster claims to bring "a level of consistent excellence **throughout the research and development process** solidifying excellence behind each of its products."[6]

77.     Despite its claimed commitment to maintaining an excellent, diligent and responsible culture of trust, including in its research and development efforts, Westminster's CEO claims the recent Adulterated Irbesartan recall originating with Aurobindo was "unexpected."

78.     However, Aurobindo, the initial source of the Adulterated Irbesartan that Westminster marketed and distributed nationally, has been repeatedly criticized by the FDA in recent years for lax and substandard manufacturing practices as discussed above.

---

[4] *Manufacturing Excellence*, WESTMINSTER, https://www.wprx.com/ (last visited Nov. 9, 2018).

[5] *Id.*

[6] *Id.* (emphasis added).

79.     Westminster's representations and warranties regarding its devotion to quality, diligence, and excellence in both research and manufacturing are false. To the contrary, the Adulterated Irbesartan that Westminster marketed, sold, and distributed nationally was not safe, fell substanitally short of excellent, and was not the product of a diligent and quality conscious research and manufacturing process.

80.     Plaintiff purchased, and ingested Adulterated Irbesartan from the Walmart pharmacy located at 8730 Liberty Rd, Randallstown, Md 21133. Walmart is a "direct account" of Westminster, from whom it received medications containing Adulterated Irbesartan for the purpose of resale.

81.     On or about October 30, 2018, Plaintiff received a notice from Walmart recalling medications, the Lots subject to the ScieGen Recall which had been sent to Westminster.

82.     Plaintiff suffered economic damages when she paid to purchase Adulterated Irbesartan. Plaintiff would not have purchased the worthless Adulterated Irbesartan from Defendants had they known that it was contaminated with NDEA.

83.     Plaintiff also needs medical monitoring as a result of her consumption of the Adulterated Irbesartan.  Finally, she underwent a nephrectomy on January 11, 2018 as a result of the exposure to Adulterated Irbesartan.

## ALLEGATIONS

84.     Plaintiff purchased and/or ingested Adulterated Irbesartan that was subject to the Aurobindo Recall and the ScieGen Recall.

85.     Plaintiff brings Counts I through IX below, pursuant to

## COUNT I

**Strict Product Liability**

87.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

88.    At all times relevant to this action, Defendants designed, tested, manufactured, packaged, marketed, supplied, distributed, promoted, and/or sold the Adulterated Irbesartan, placing the drug into the stream of commerce.

89.    At all relevant times, the Adulterated Irbesartan was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

90.    The Adulterated Irbesartan was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was manufactured and sold.

91.    The Adulterated Irbesartan was unreasonably dangerous because it was adulterated and contaminated by NDEA, a probable human carcinogen.

92.    The Adulterated Irbesartan was not accompanied by adequate labeling, instructions for use and/or warnings to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks associated with its use, thereby rendering Defendants liable to Plaintiff.

93.    The Adulterated Irbesartan was unsafe for normal or reasonably anticipated use.

94.    The Adulterated Irbesartan was defective in formulation because when the drug left the hands of the Defendants, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

95.     The Adulterated Irbesartan was also defective and unreasonably dangerous in that the foreseeable risk of injuries from consuming the Adulterated Irbesartan exceeded the benefits associated with the formulation of the Adulterated Irbesartan.

96.     The Adulterated Irbesartan is unreasonably dangerous; a) in construction or composition; b) in design; c) because an adequate warning about it was not provided; and d) because the Adulterated Irbesartan did not conform to an express warranty about the product.

97.      The Adulterated Irbesartan as manufactured, distributed, supplied, and/or sold by the Defendants was also defective due to inadequate testing before being exposed to Plaintiff.

98.     The Adulterated Irbesartan as manufactured, distributed, supplied and/or sold by Defendants was defective and after Defendants knew or should have known of the risk of injuries from use and/or ingestion, they failed to provide adequate warnings to the medical community and the consumers to whom they were directly marketing and advertising; and, further, they continued to affirmatively promote Adulterated Irbesartan as safe and effective.

99.     In light of the potential and actual risk of harm associated with the consumption of the Adulterated Irbesartan, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that the Adulterated Irbesartan should not have been marketed in that condition.

100.     Although Defendants knew or should have known of the defective nature of the Adulterated Irbesartan, they continued to manufacture, market, distribute and/or sell it so as to maximize sales and profits at the expense of the public health and safety. Defendants thus acted with conscious and deliberate disregard of the foreseeable harm caused by the Adulterated Irbesartan.

101.     Plaintiff could not, through the exercise of reasonable care, have discovered the

risk of serious injury and/or death associated with and/or caused by their consumption of the Adulterated Irbesartan.

102.     As a direct and proximate result of Defendants' conduct, Plaintiff purchased and/or consumed Adulterated Irbesartan, and, as a result, Plaintiff suffered harm and loss.

103.     Information provided by the Defendants to the medical community and to consumers concerning the safety and efficacy of the Adulterated Irbesartan, especially the information contained in the advertising and promotional materials, did not accurately reflect the serious and potentially fatal side effects resulting from consumption of the Adulterated Irbesartan.

**COUNT II**
**Failure to Warn**

104.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

105.     Defendants violated a state-law duty of care by failing to report known risks associated with the consumption of the Adulterated Irbesartan

106.     Defendants failed to adequately warn health care professionals and the public, including Plaintiff and her physicians, of the true risks of the Adulterated Irbesartan, including the risks associated with the consumption of NDEA. Defendants owed a duty to exercise ordinary care. Defendants breached their duty to exercise ordinary care to supply, manufacture, distribute, and/or sell irbesartan to Plaintiff that was not adulterated.

107.     Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Adulterated Irbesartan.

108.     Defendants failed to perform or otherwise facilitate adequate testing or failed to reveal and/or concealed testing performed on the irbesartan.

109.     As a direct and proximate cause of the Defendants' conduct, Plaintiff suffered economic loss.

110.     Defendants' conduct was reckless. Defendants risked the lives and health of consumers, including Plaintiff, based on the suppression of knowledge relating to the safety and efficacy problems associated with the Adulterated Irbesartan.

111.     Upon information and belief, Defendants made a conscious decision not to notify the FDA, healthcare professionals, and the public, thereby putting increased profits over the public safety, including the safety of the Plaintiff. Defendants' actions and omissions as alleged herein demonstrate an utter disregard for human safety, warranting the imposition of punitive damages.

## COUNT III
### Breach of Contract

112.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

113.     Plaintiff formed a contract with Defendants at the time they purchased the Adulterated Irbesartan.

114.     The terms of the contract include the promises and affirmations of fact in the advertising, and on the packaging and labeling for the medicine, including that the Adulterated Irbesartan would not be adulterated with harmful and carcinogenic impurities such as NDEA.

115.     Defendants represented that the Adulterated Irbesartan was safe and unadulterated. The promises and affirmations of fact became part of the basis of the bargain and are a part of the contract between Plaintiff, and the Defendants.

116.     Defendants also represented that the Adulterated Irbesartan was safe, efficacious and fit for its intended purposes, that it was of merchantable quality, that it did not produce any

unwarned-of dangerous side effects, and that it was adequately tested.

117.    Plaintiff relied on Defendants' representations that the Adulterated Irbesartan would not be adulterated with harmful and carcinogenic impurities such as NDEA.

118.    Plaintiff performed all conditions precedent pursuant to their contract with Defendants.

119.    Defendants breached the contract because the Adulterated Irbesartan was adulterated and contaminated with the carcinogen NDEA.

120.    Plaintiff has been damaged in the amount of the purchase price of the Adulterated Irbesartan and consequential economic damages, including incidental medical expenses, resulting therefrom.

<u>**COUNT IV**</u>
**Breach of Implied Warranty of Merchantability**

121.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

122.    Defendants, as the designers, manufacturers, distributors and/or sellers of the Adulterated Irbesartan, impliedly warranted that the Adulterated Irbesartan purchased by Plaintiff was safe for human consumption, that the Adulterated Irbesartan was not adulterated, and that the Adulterated Irbesartan did not contain NDEA.

123.    Defendants breached the warranty implied in the contract for the sale of the irbesartan because the Adulterated Irbesartan could not pass without objection in the trade under the contract description, it was not of the quality described, and it was unfit for its intended and ordinary purpose because it was adulterated, containing NDEA, and therefore unfit for human consumption. As a result, Plaintiff did not receive irbesartan as impliedly warranted by the Defendants to be merchantable.

124.     Plaintiff purchased the Adulterated Irbesartan in reliance on the Defendants' implied warranties of fitness for a particular purpose.

125.     Plaintiff did not alter the Adulterated Irbesartan.

126.     The Adulterated Irbesartan was defective when it left the exclusive control of the Defendants.

127.     The Adulterated Irbesartan was defectively manufactured and unfit for its intended purpose and Plaintiff did not receive the Adulterated Irbesartan in the condition warranted.

128.     As a direct and proximate result of the Defendants' breach of the implied warranty, Plaintiff has been harmed and injured because (a) they would not have purchased the Adulterated Irbesartan containing NDEA if they had known that such irbesartan was adulterated by NDEA; (b) the Adulterated Irbesartan does not have the characteristics, ingredients, uses, or benefits as promised by the Defendants; (c) the Adulterated Irbesartan has never been tested for human consumption; (d) the Adulterated Irbesartan has never been tested for efficacy; and (e) the Adulterated Irbesartan is worthless.

## COUNT V
**Unjust Enrichment**

129.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

130.     Plaintiff conferred a benefit on Defendants by purchasing the Adulterated Irbesartan, which was worthless, adulterated, dangerous, and contained NDEA.

131.     Defendants voluntarily accepted and retained the conferred benefits by accepting payment for the Adulterated Irbesartan.

132.      It is inequitable and unjust for Defendants to retain the revenues obtained from

purchases of the Adulterated Irbesartan by Plaintiff because Defendants misrepresented the qualities of the Adulterated Irbesartan and the Adulterated Irbesartan could not be used for the manner represented by Defendants.

133.    Accordingly, because Defendants will be unjustly enriched if allowed to retain such funds, Defendants must pay restitution to Plaintiff  in the amount which Defendants were unjustly enriched by each purchase of the Adulterated Irbesartan.

134.    Plaintiff does not have an adequate remedy at law against Defendants, in the alternative to the other causes of action alleged herein.

**COUNT VI**
**Fraudulent Concealment**

135.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

136.    Defendants had a duty to disclose material facts to Plaintiff that they were in fact manufacturing, distributing and/or selling irbesartan that was adulterated, contained NDEA and that the Adulterated Irbesartan was unfit for human consumption.

137.    Defendants knew or should have known that they should have disclosed such material facts to consumers such as Plaintiff.

138.    Defendants had superior knowledge such that the purchases of the Adulterated Irbesartan by Plaintiff were inherently unfair.

139.    Upon information and belief, Defendants possessed knowledge of the material facts.

140.    Upon information and belief, Defendants may have thus withheld their knowledge of the contamination. During that time, Plaintiff purchased and/or consumed the Adulterated Irbesartan without knowing that they were consuming NDEA.

141.    Defendants failed to discharge their duty to disclose material facts.

142.    Upon information and belief, Defendants, with scienter and/or an intent to defraud, intended to hide from Plaintiff that they were purchasing and consuming Adulterated Irbesartan that was contaminated by NDEA rendering the medicine unfit for human consumption.

143.    Plaintiff reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the Adulterated Irbesartan manufactured, distributed and/or sold by Defendants had they known it was contaminated with NDEA and thus adulterated.

144.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff suffered damages in the amount of money paid for the Adulterated Irbesartan and incidental medical expenses.

**COUNT VII**
**Conversion**

145.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

146.    Defendants exercised control over the money paid by the Plaintiff which is inconsistent with the right of Plaintiff to possession of the money paid to purchase the Adulterated Irbesartan.

147.    Plaintiff has a right to possession of the money paid to purchase the Adulterated Irbesartan.

148.    Demand for return of the money by Plaintiff would be futile.

**COUNT VIII**
**Negligence**

149.    Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this Complaint as though fully set forth herein.

150.     Defendants supplied, manufactured, distributed and/or sold irbesartan as a drug for consumption by the Plaintiff.

151.     Defendants had a duty to exercise ordinary care to supply, manufacture, distribute and/or sell irbesartan to Plaintiff that was not adulterated.

152.     Defendants breached their duty of care owed to the Plaintiff by:

    a.     supplying, manufacturing, distributing and/or selling irbesartan to Plaintiff that was adulterated because it was contaminated by NDEA;

    b.     failing to maintain appropriate quality control procedures thereby allowing NDEA to contaminate irbesartan purchased and/or consumed by Plaintiff;

153.     Defendants' breach of the duty of care proximately caused damage to Plaintiff.

## COUNT IX
## Gross Negligence

154.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein.

155.     Defendants' conduct resulted in an extreme risk to the Plaintiff.

156.     Upon information and belief, Defendants knew, or should have known of the extreme risk to Plaintiff but continued with their conduct anyway.

157.     The Defendants' conduct was more than just negligent, it amounts to gross negligence and amounted to recklessness or aggravated negligence resulting from an extreme departure from the ordinary standard of care owed to Plaintiff.

158.     The Defendants' conduct was so unreasonable and dangerous that it was highly probable that harm would result.

159.    The Defendants' conduct created circumstances constituting an imminent or clear and present danger.

**<u>COUNT X</u>**
**Violation of the Maryland Consumer Protection Act, a Private Cause Of Action for Unfair or Deceptive Trade Practices Law Title 13, Subtitle 3, Section 13-301 et seq.**

160.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as if fully set forth herein.

161.    The Maryland Consumer Practices Act, Title 13, Subtitle 3, Section 13-301 et seq. prohibits deceptive acts and practices in the sale of products, including the Adulterated Irbesartan.

162.    Plaintiff is a "consumer" or "person," as defined under the MD Comm. Code §13-301.

163.    Defendants' conduct as alleged herein occurred in the course of trade or commerce.

164.    Defendants supplied an Adulterated Irbesartan to Illinois retailers, including the Walmart pharmacy located at 8730 Liberty RD, Randallstown, MD 21133, where it was purchased by Plaintiff.

165.    Defendants profited from their transactions occurring with Maryland retailers.

166.    Defendants misrepresented on their labels and otherwise, the characteristics of the Adulterated Irbesartan, the ingredients in the Adulterated Irbesartan, and the uses or benefits of the medications containing Adulterated Irbesartan.

167.    Additionally, Defendants misrepresented, and deceived Plaintiff into believing, that the Adulterated Irbesartan was safe for human consumption, that the Adulterated Irbesartan

did not contain NDEA, and that the Adulterated Irbesartan was not adulterated.

168.     In fact, the Adulterated Irbesartan did not have the characteristics, ingredients, uses or benefits represented, it was not safe for human consumption, it did contain NDEA, and it was adulterated. This offends public policy, and has caused and continues to cause substantial injury to Plaintiff, and constitutes an unfair and deceptive trade practice.

169.     Upon information and belief, and given the fact that Defendants were responsible for supplying, manufacturing, distributing and/or selling the Adulterated Irbesartan to Plaintiff, Defendants knew or should have known at all relevant times that the irbesartan was adulterated because it contained NDEA and was not safe for human consumption. Nonetheless, Defendants falsely represented that the Adulterated Irbesartan purchased by the Plaintiff was safe for human consumption when it was not.

170.     Defendants intended for consumers, including Plaintiff, to rely on its representations that the Adulterated Irbesartan was safe for human consumption when choosing to purchase the drug. Plaintiff relied on such representations in making their decision to purchase the Adulterated Irbesartan.

171.     As a direct and proximate result of Defendants' deceptive and unfair trade practices, Plaintiff suffered actual damages, including monetary losses for the purchase price of the Adulterated Irbesartan which was not safe for human consumption and was worthless, and incidental medical expenses.

172.     Defendants' conduct violates the Maryland Consumer Protection Act, Plaintiff is entitled to damages in an amount to be proven at trial, reasonable attorneys' fees, injunctive relief prohibiting Defendants' unfair and deceptive practices going forward, medical monitoring, and any other penalties or awards that may be appropriate under applicable law.

WHEREFORE, Plaintiff makes demand for judgment against Defendants, and requests compensatory damages in excess of $75,000.00 for pain and suffering, payment for the medical costs and expenses incurred, punitive and exemplary damages, prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees as allowed by law, and any and all other relief the Court deems just and proper; and further, demand a trial by jury of all issues.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, LLC**

By: _____/s/_____
      Robert E. Joyce
      Attorney Bar No.:  0012120336
      P.O. Box 27166
      1010 Light Street
      Baltimore, Maryland 21230
      Phone:  (410) 547-8568
      Fax:     (410) 547-0036
      E-mail:  RJoyce@barryglazer.com

      Attorneys for Plaintiff

### PRAYER FOR JURY TRIAL

Plaintiff by and through undersigned counsel, hereby respectfully requests a trial by jury in this matter.

Respectfully Submitted,

**LAW OFFICE OF BARRY R. GLAZER, LLC**

By: _____/s/_____
Robert E. Joyce
Attorney Bar No.: 0012120336
P.O. Box 27166
1010 Light Street
Baltimore, Maryland 21230
Phone: (410) 547-8568
Fax: (410) 547-0036
E-mail: RJoyce@barryglazer.com

Attorneys for Plaintiff